# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
# FORT LAUDERDALE DIVISION

――――――――――――――――――――――――

### CASE NO. 23-cv-61382-SINGHAL

――――――――――――――――――――――――

JOHN H. OWOC and MEGAN E. OWOC
Appellants,

vs.

VITAL PHARMACEUTICALS, INC., *et al.*,
Appellees.

――――――――――――――――――――――――

ON APPEAL FROM THE COURT
SOUTHERN DISTRICT OF FLORIDA
LOWER TRIBUNAL ADV. CASE NO. 23-01051-PDR-A

――――――――――――――――――――――――

## APPELLANTS' INITIAL BRIEF

**SCHOEPPL LAW, PA**
*Lead Appellate Counsel for Appellants*
*John H. Owoc and Megan E. Owoc*
160 West Camino Real, No. 229
Boca Raton, Florida 33432-5942
Telephone: (561) 394-8301
Facsimile: (561) 394-3121
Email: carl@schoeppllaw.com

**PHANG&FELDMAN, PA**
*Counsel for Appellants*
*John H. Owoc and Megan E. Owoc*
One Biscayne Tower, Suite 1600
2 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 614-1223
Facsimile: (305) 614-1187
Email: feldman@katiephang.com

**MARTINEZ-CID LAW**
*Counsel for Appellants*
*John H. Owoc and Megan E. Owoc*
1 S.E. 3rd Avenue, Suite 2300
Miami, Florida 33131
Telephone: (305) 704-9162
Email: jmartinez-cid@martinez-cidlaw.com
Email: tgray@martinez-cidlaw.com
Email: ahernandez@martinez-cidlaw.com

**ERICA W. STUMP, P.A.**
*Counsel for Appellants*
*John H. Owoc and Megan E. Owoc*
110 E. Broward Blvd., Suite 1700
Fort Lauderdale, FL 33301
Telephone: (954) 828-2334
Facsimile: (954) 278-8510
Email: erica@ericawstump.com

i

## TABLE OF CONTENTS

Page(s)

**REQUEST FOR ORAL ARGUMENT** …………………………………………1

**STANDARD OF REVIEW**..............................................................................1

**STATEMENT OF ISSUES PRESENTED FOR REVIEW** ...............................2

**STATEMENT OF FACTS**...............................................................................4

     **A.  The Persona of "Jack Owoc" and His Creation
         of the CEO Accounts** ........................................................5

     **B.  Jack Owoc as a "Market Maker"**.........................................9

**SUMMARY OF THE ARGUMENT** ...............................................11

**ARGUMENT** ................................................................................14

     **A. The Bankruptcy Court Erred by Failing to Establish Its
        Jurisdiction to Enter the Order, Which Should Be
        Deemed Invalid.** .........................................................14

     **B. The CEO Accounts are bound by Executory Contracts,
        which were not Identified in the Bankruptcy Filings
        and are Deemed Rejected.** .............................................14

     **C. The Court should have Stricken the Testimony of
        John DiDinato.** ...........................................................17

     **D. The Ownership Test is Defective.** ........................................17

         *1. The Ownership Test ignores the absence of corporate
           policies or contracts establishing corporate ownership
           of social media.*……………………………………………………..18

i

    2. *The Ownership Test ignores the likely violation
of federal and state law and / or terms of the social media
platforms*………..…………………………………..………….. 18

    3. *The Ownership Test ignores Jack Owoc's
intellectual property rights to his name, image, and likeness*……. 19

    4. *The Ownership Test fails to account for disparate treatment of
purportedly similar owned accounts*………………………… 20

    5. *The Ownership Test de-prioritizes exclusive
control over custody, access, and content creation as factors*……. 21

    6. *The amorphous and subjective use-factor is defective*…………… 22

    7. *The Ownership Test cannot be fairly applied
to Market Makers*……………………………………………. 23

  E.  **The Court Misapplied its Own Test.**......................................................25

  F.  **Justice Here Requires Appellants Be Permitted to Conduct
Discovery.**................................................................................................28

**CONCLUSION**...............................................................................................30

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*777 Partners LLC v. Pagnanelli*,
   20-20172-CIV, 2022 WL 17985958, at *1 (S.D. Fla. Dec. 29, 2022)..................31

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242, 248 (1986)...................................................................................1

*Celotex Corp. v. Catrett*,
   477 U.S. 317, 322-4 (1986) ...............................................................................1

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
   752 F.3d 173 (2d Cir. 2014) ...............................................................................6

*Eagle v. Morgan*,
   2013 WL 943350, at *10 (E.D. Pa. Mar. 12, 2013) ................................. 15, 17, 19

*Fernandez v. Bankers Nat. Life Ins. Co.*,
   906 F.2d 559, 570 (11th Cir. 1990) ...................................................................31

*In re Alexandria Surveys Int'l, LLC*,
   500 B.R. 817, 822 (E.D. Va. 2013). ...................................................................16

*In re Cogswell*,
   622 B.R. 109, 111 (Bankr. M.D. Fla. 2020)........................................................23

*In re CTLI, LLC*,
   528 B.R. 359, 367 (Bankr. S.D. Tex. 2015) ..........................................................6

*In re Marill Alarm Systems, Inc.*,
   81 B.R. 119, 122 (S.D. Fla. 1987) .....................................................................14

*In re Powell*,
   Case No. C17-1268RSL, Bankr. Case No. 12-11140MLB (W.D. Wash. Sep 11,
   2017) ..............................................................................................................16

*In re Thrifty Dutchman, Inc.,*

97 B.R. 101, 106 (Bankr. S.D. Fla. 1988)............................................................24

*In re UBS AG Sec. Litig.*,
07 CIV. 11225 RJS, 2012 WL 4471265, at *32 (S.D.N.Y. Sept. 28, 2012) ............6

*Jaques v. Kendrick*,
43 F.3d 628, 630 (11th Cir. 1995) ..........................................................................1

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574, 587 (1986)........................................................................................2

*Mella v. Ahmadzai*,
12-CV-23654-JLK, 2013 WL 12064509, at *2 (S.D. Fla. Sept. 5, 2013) ...... 14, 29

*Nestle USA, Inc. v. Gunther Grant, Inc.,*
CV-13-6754 MMM (ASX), 2014 WL 12558008, at *1 (C.D. Cal. May 13, 2014)7

*PhoneDog v. Kravitz,*
C 11-03474 MEJ, 2011 WL 5415612, at *9 (N.D. Cal. Nov. 8, 2011).................28

*S.E.C. v. First Jersey Sec., Inc.*,
890 F. Supp. 1185, 1197 (S.D.N.Y. 1995)............................................................10

*Sony v. Vital Pharm.*,
1:21-cv-2285 (S.D. Fla.) ..........................................................................................7

*St. Charles Foods, Inc. v. America's Favorite Chicken Co.*,
198 F.3d 815, 819 (11th Cir. 1999) .........................................................................2

*Staehr v. Hartford Fin. Servs. Grp.*,
547 F.3d 406, 425 (2d Cir. 2008) ............................................................................6

## Statutes

21 U.S.C. § 1125(a)....................................................................................................20

28 U.S.C. § 157(b)(3)........................................................................................... 14, 15

Fla. Stat. § 540.08 .....................................................................................................20

**Rules**

Fed. R. Bankr. P. 1007(b)(1)(C) ...................................................................................18

Fed. R. Civ. P. 56(c)(4) ...............................................................................................18

Fed. R. Civ. P. 56(c). ....................................................................................................1

Fed. R. Evid. 602 .........................................................................................................18

**Treatises**

Alexandra L. Jamel,
  *Mixing Business with Pleasure: Evaluating the Blurred Line Between the
Ownership of Business and Personal Social Media Accounts Under § 541(A)(1)*,
  33 EMORY BANKR. DEV. J. 561, 587-589 (2017) ............................................16

## <u>FEDERAL BANKRUPTCY RULE 8012 DISCLOSURE STATEMENT</u>

Appellants John H. Owoc and Megan E. Owoc, by and through their undersigned counsel, hereby identify the following persons, associated persons, firms, partnerships or corporations that have a financial interest in the outcome of this case, including subsidiaries, conglomerates, affiliates, parent corporations, and other identifiable legal entities related to a party:

1. Bang Energy Canada, Inc., Appellee

2. JHO Intellectual Property Holdings, LLC, Appellee

3. JHO Real Estate Investment, LLC, Appellee

4. Owoc, John H., Appellant/Defendant

5. Owoc, Megan E., Defendant

6. Quash Seltzer, LLC, Appellee

7. Rainbow Unicorn Bev LLC, Appellee

8. Vital Pharmaceuticals, Inc., Appellee

9. Vital Pharmaceuticals International Sales, Inc., Appellee

10. Monster Energy Company

## <u>REQUEST FOR ORAL ARGUMENT</u>

Appellants request oral argument in this cause pursuant to Southern District of Florida Local Rule 87.4(g).  This appeal raises a number of significant legal issues and the Court would be significantly aided by oral argument.

## <u>STANDARD OF REVIEW</u>

The District Court reviews grants of summary judgment under a *de novo* standard of review.  *Jaques v. Kendrick*, 43 F.3d 628, 630 (11th Cir. 1995). Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant bears the initial burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-4 (1986). A material fact is one that "might affect the outcome of the suit under the governing law" and that all facts must be viewed in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is no genuine issue of material fact when "the record taken as a whole could not lead the rational trier of fact to find for the non-moving party."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The Court must view all evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party. *St. Charles Foods, Inc. v. America's Favorite Chicken Co.*, 198 F.3d 815, 819 (11th Cir. 1999).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.      Whether the bankruptcy court (the "Court") erred in entering its Order Granting Plaintiffs' Motion for Summary Judgment and Order of Final Judgment (collectively, the "Order"). ECF No. 161.

2.      Whether the Court lacked jurisdiction to adjudicate the dispute involving the social media accounts as it was a non-core proceeding.

3.      Whether the Court erred in prematurely granting Summary Judgment where Appellants had not yet had an adequate time for discovery, nor had an opportunity to establish a record regarding the claims at issue through discovery.

4.      Whether the Court made findings of fact that were clearly erroneous, resolved disputed issues of fact, and / or failed to construe all facts and draw all reasonable inference in the light most favorable to Appellants in extrapolating from a tiny portion of social media content.

5.      Whether the Court made findings of fact that were clearly erroneous, resolved disputed issues of fact, and / or failed to construe all facts and draw all reasonable inference in the light most favorable to Appellants in its findings concerning the creation, maintenance, and control of the social media accounts.

6.    Whether the Court made findings of fact that were clearly erroneous, resolved disputed issues of fact, and / or failed to construe all facts and draw all reasonable inference in the light most favorable to Appellants in its findings as to how the social media accounts at issue were used.

7.    Whether the Court erred in failing to strike declaration testimony from John DiDonato that was not based upon DiDonato's personal knowledge.

8.    Whether the Court erred by crafting and relying upon the wrong standard to determine ownership of the social media accounts, and erred in its application of the standard in that, *inter alia*, two of the three factors (Documented Property Interest and Control Over Access) clearly favored the Appellants.

9.    Whether the Court made findings of fact that were clearly erroneous, resolved disputed issues of fact, and / or failed to construe all facts and draw all reasonable inference in the light most favorable to Appellants in concluding that the mere presence of Debtors' product or logo in an image transformed the posting wholly into a pure or implicit promotional posting, favoring Debtors' alleged ownership, notwithstanding the nature, context, language, or impact of the posting.

10.   Whether the Order of the Court should be set aside as violating Florida's public policy favoring the enforcement of contracts in that the Order conflicts with the contracts between Appellants and the social media account companies themselves.

11.     Whether the Court abused its discretion and otherwise erred in concluding that the social media accounts were the property of the Debtors notwithstanding the absence of executed employment contracts and/or acknowledgments of the employee handbooks for either of the Owocs.

## STATEMENT OF FACTS

Appellant, John a/k/a "Jack" Owoc, founder of Vital Pharmaceuticals, Inc. ("VPX") and the other former debtors (collectively, the "Debtors"), served as the Debtors' sole board member, sole shareholder, CSO, and CEO for more than twenty-nine (29) years. [ECF 16-3 p. 17 ¶1][1] Appellant Megan E. Owoc, Jack Owoc's wife, is the former Senior V/P of Marketing for VPX.

In March 2022, the Debtors terminated Mr. Owoc and his wife, and within days thereof, instituted an adversary proceeding asserting essentially for the first time since their creation, that three (3) of Mr. Owoc's social media accounts (the "CEO Accounts")[2] were the property of the Debtors and not Mr. Owoc.  [ECF 16-2 p.2 ¶ 2; ECF 16-3 p. 21 ¶ 18]

On June 16, 2023, the Court entered an order granting summary judgment (the

---

[1]     All "ECF" citations are made to the docket number of this Court.  All page numbers refer to the blue pagination at the top of the page cited. All "DE" citations refer to the adversary proceeding docket.

[2]     The "CEO Accounts" refers to the Instagram and TikTok accounts "@bangenergy.ceo" and the Twitter account "@BangEnergyCEO."  [ECF 16-2 p. 1-2]

"Order") in favor of the Debtors.  [ECF 161-6 p. 164]  The Order was merged into a Final Judgment on July 5, 2023, [ECF 16-7 p. 299], from which the Owocs now take this appeal.[3]

### A.  The Persona of "Jack Owoc" and His Creation of the CEO Accounts

Over his twenty-nine (29) year tenure, Jack Owoc literally rose from "sleeping on an air mattress in the back" of the Debtors' then-humble shop to stewarding VPX to "over $6 billion in retail sales" of various energy drinks, energy shots, and supplements.  [ECF 16-3 p. 18 ¶ 4] As if Debtors' meteoric success was not enough to force the entire energy drink market to take notice, the unforgettable, iconoclastic, and sensationalistic style of its leader was, leading pundits to suggest that Jack Owoc (in this case, Jack Owoc's persona)[4] was the driving force behind the Debtors' market success of the Debtors' flagship product, Bang Energy drink.[5]

---

[3]      Blast Asset Acquisition, LLC, which purchased substantially all of the Debtors' assets, purportedly including the CEO Accounts here at issue, was substituted into this case as a party by order of this District Court.  [ECF 29]

[4]      A persona is "the interest of the individual in the exclusive use of his own identity, in so far as it is represented by his name or likeness, and in so far as the use may be of benefit to him or to others. *In re CTLI, LLC*, 528 B.R. 359, 367 (Bankr. S.D. Tex. 2015).

[5]      *See* **Ex. A**, *How Bang Energy's flashy, neon world of influencers conquered TikTok*, Morning Brew, March 8, 2022, visited on November 27, 2023 at 11:24 a.m. (the "Morning Brew Artic."). Appellants respectfully request this Court take judicial notice pursuant to FRE 201 of **Exs. A** and **C,**  not for the truth of the matters contained therein but merely for the fact of their utterance as reflective of what some pundits have stated. *See, e.g., Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 425 (2d Cir. 2008) (recognizing that "it is proper to take judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings contained certain information,

Mr. Owoc has been both lauded and derided by pundits who described him as the "ambassador for the excessively showy lifestyle the brand sells." *See generally,* **Ex. A**, Morning Brew Artic. at 2.  As reflected in the snapshots and video-footage posted on the CEO Accounts, whether giving speeches, receiving awards, discussing health, nutrition, or weightlifting, or even while lifting weights in his home gym, or out fishing with his family -- Mr. Owoc routinely and consistently chose to appear in colorful Bang-branded apparel, wearing a  gold necklace and 6" diamond studded "B" pendant -- which is a replication of the B logo appearing on the Bang Energy drink itself.  [ECF 16-3 p. 41].  Further, as reflected in many of the same snapshots, Mr. Owoc elected to use every public appearance and many of his own social media posts as an opportunity to display and market his products -- even routinely appearing at depositions adorned in Bang Energy apparel, bringing with him multiple cans of VPX products.  *See, e.g.*, **Ex. B**, Excerpts from May 24, 2022 Sony Deposition ("Sony Dep.") at p. 28-29 (bearing two (2) VPX products).[6]

He has been described as "charismatic," and in 2010, ESPN allegedly likened

---

without regard to the truth of their contents"); *In re UBS AG Sec. Litig.*, 07 CIV. 11225 RJS, 2012 WL 4471265, at *32 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014) ("the Court may take judicial notice of the publication of such articles without transforming the [motion to dismiss] into a motion for summary judgment.").

[6]      Appellants respectfully request this Court take judicial notice pursuant to FRE 201 of the excerpts from the May 22, 2022 deposition of Jack Owoc in *Sony v. Vital Pharm.*, 1:21-cv-2285 (S.D. Fla.) as this is an official record from a court proceeding and previously introduced (in part) and relied upon by the lower court.

him to "the Willy Wonka of the supplement world."[7]  *See* **Ex. A**, Morning Brew Artic. At 3.  He's also been described as a "trash-talking, chest baring, only-in-Florida entrepreneur."  *See* **Ex. C,** 'I Am Energy': Inside the Bang Billionaire's Reeling Empire, Businessweek, Oct. 6, 2022.  While perhaps unknown to the public at large, but nonetheless recognized by some pundits, was the fact that Jack Owoc's omnipresent colorful and shiny Bang apparel, gold necklace and "B" logo brand pendant, as well as his brash, stop-at-nothing, image was also created, cultivated and maintained by the Owocs as the 'Jack Owoc persona' to create mutually beneficial synergy between his own products and his own persona.[8]  [ECF 16-3 p. 19 ¶¶ 7-10]

     As part of the Owocs' marketing strategy, they caused the Debtors to rely heavily on social media, in a manner described by some pundits as theretofore unseen, for example, by employing hundreds of social media influencers and opening and operating more than fifty (50) social media accounts on Instagram, TikTok, and Twitter (the "Corporate Accounts"). [ECF 16-3 p. 21 ¶ 20] However, separate from these Corporate Accounts, at Jack Owoc's direction, he and Meg

---

[7]     *See Nestle USA, Inc. v. Gunther Grant, Inc.,* CV-13-6754 MMM (ASX), 2014 WL 12558008, at *1 (C.D. Cal. May 13, 2014) (describing Willy Wonka as "the name of the eccentric chocolatier in the popular children's book turned two-time movie," and taking judicial notice of the same).

[8]     A humorous but insightful reflection of this marketing synergy is reflected in a quote attributed to comedian Trevor Wallace stating, "You think I give a f**k what's in here? They got hot chicks and a dope CEO." **Ex. A,** Morning Brew Artic. at p. 7.

Owoc created (and in the case of Tik Tok, caused to be created) the three (3) social media accounts that Mr. Owoc intended, and that the Debtors understood, to be the personal property of Jack Owoc, *i.e.*, the CEO Accounts.  [ECF 16-3 p. 19 ¶¶ 9-13]

For example, during the May 24, 2022 Sony Deposition, Mr. Owoc repeatedly was asked, and testified about, the CEO Accounts as his own, personal social media accounts, all while in the presence of Debtors' then-General Counsel, Gregg Metzger, Esq.  *See* **Ex. B**, Sony Dep. at 11:25-12:1.  But the Debtors did nothing to disabuse him of this belief, or memorialize their alleged ownership.  For further example, on February 22, 2023, VPX's in-house IP counsel, Gideon Eckhouse, Esq., confirmed by e-mail, that Mr. Owoc's personal social media accounts would not be included as part of the bankruptcy estate.  [ECF 16-3 p. 210 ¶ 18; *Id.* at p. 217].

The CEO Accounts from their start were handled differently from the Corporate Accounts, by both the Debtors and the Owocs. [ECF 16-3 p. 210 ¶¶ 20-25]  Whereas the employees of the marketing department held the passwords to the Corporate Accounts, *id.* at ¶¶ 17-19, and held discretion generally to post or delete as they saw fit, ECF 16-3 p. 21 ¶ 25, no one beyond the Owocs' held the passwords or could access the CEO Accounts – other than as specifically permitted by Mr. Owoc.  [ECF 16-3 p. 21 ¶ 19]  Further, Mr. Owoc exercised exclusive control over the content of the CEO Accounts.  *Id.* at ¶ 16.

### B.       Jack Owoc as a "Market Maker"

It is no coincidence that pundits have likened Jack Owoc to the fictional character, Willy Wonka, and described Owoc as Bang's "brand ambassador" – the fictional character of Wonka is so closely tied to desserts, specifically chocolate, that in the minds of audience members, Wonka embodies chocolate.  But at the same time, Wonka's own independent wit, joy, whimsy, and even magic, also is in the mind of audience members connected to his product such that Wonka's chocolate itself, now evokes wit, joy, whimsy, and even magic.  Indeed, both Wonka and Mr. Owoc are "Market Makers."[9]  Willy Wonka's connection with Jack Owoc is magical. Astonishingly, ESPN clairvoyantly captured this over a decade ago having never known that Jack would create the world's first chocolate flavored energy drink called Bang Whole Lotta Chocolatta.

"Market Makers" are here defined as an owner or CEO who develops and markets a distinctive persona, while simultaneously developing and marketing a

---

[9]       The term "Market Maker" has its origins in securities law and refers to "a broker-dealer who holds itself out to the broker-dealer community as standing ready to purchase and sell that security at particular quoted bid and asked prices and who does, as proved by actual transactions, make a continuous, two-sided market in that security."  *S.E.C. v. First Jersey Sec., Inc.*, 890 F. Supp. 1185, 1197 (S.D.N.Y. 1995), *aff'd in part, rev'd in part*, 101 F.3d 1450 (2d Cir. 1996), *and aff'd in part, rev'd in part*, 101 F.3d 1450 (2d Cir. 1996).  The term is used here because it evokes the dual-sided, synergistic marketing strategy between an owner or control person's persona and the characteristics and marketing strategy of the product.  It is otherwise unconnected to the securities definition.

brand or product, using each of them to complement, enhance, and market one another, and does so successfully and to such an extent that in the minds of the audience, *i.e.*, the market, they become largely synonymous with one another.

Real life is replete with such Market Makers.  A short list would include former President Donald Trump, Oprah Winfrey, Elon Musk, the Kardashians, and Tony Robbins.  And for each and all of them, as for Mr. Owoc, having converted their personal lives (or at least the appearance of it) into characteristics that help market their own product or company or even the United States presidency – everything they do is both personal and commercial.

Accordingly, as one would expect of Mr. Owoc's (or any other Market Maker's) personal social media, there are extensive numbers of snapshots and videos that reference the Bang product or its benefits, or discuss health and fitness, which is within the general category that Bang falls into, or that display the product.  To whatever extent a "Market Maker" can create a post described as 'purely personal content,' Mr. Owoc posted those to the CEO Accounts as well, including posts about Thanksgiving, Christmas, New Year's, Valentines Day, his wedding anniversary, children's birthdays and the birth of his children. [ECF 16-3 p. 212 ¶¶27-34. *See generally*, ECF 16-3 p. 29-206]

10

## SUMMARY OF THE ARGUMENT

The Court's entry of summary judgment in favor of the Debtors was erroneous because the Summary Judgment Order (the "Order") does not take into consideration the fact that courts have held that social media accounts like the CEO Accounts are not property rights but are instead a service contract and are governed by terms, or contracts, set forth by the social media platforms.  The Debtors did not list these contracts on their initial bankruptcy papers as required by the bankruptcy rules, which means they are deemed rejected and not part of the estate.  The Debtor's failure to include these contracts is fatal.

Moreover, the Court's entry of summary judgment in favor of the Debtors was reversible error because there was more than enough evidence in the record from which a reasonable jury could have found that Jack Owoc personally owned each of the CEO Accounts.  Without affording the Owocs any opportunity to brief or comment upon it, the Court created an entirely new test (the "Ownership Test") to evaluate ownership of social media:  (1) a documented property interest as reflected, for example, in a contract or account opening document; (2) exclusive control over access to and use of the account; and (3) the type of use to which the accounts were put, *i.e.*, personal use or three (3) categories of commercial marketing or use.

Of fundamental and reversible error on its own, the Ownership Test itself is defective.  In what appears to be yet another instance of the result dictating the

analysis by Judge Russin, the test is obviously and heavily weighted in favor of the corporation's ownership over individual rights.   The Ownership Test, while reflecting a nod towards the fundamental indicia of ownership, ignores basic and key factors that, had they been included, would have comported with the laws of property and contracts, *and* would have been an even-handed test.

Indeed, the Ownership Test itself is fundamentally defective because it is not universally applicable and is also guaranteed to result in an adverse ruling for a Market Maker.   In short, the Ownership Test is predicated upon norms and assumptions that apply where the individual was an employee or contractor who was hired only as a social media influencer.   However, the Ownership Test is unfair and incompatible where the individual created and marketed the product, while simultaneously creating and marketing a persona that not only carried independent worth and value, but that also was fundamentally intertwined with the company and the product itself, *i.e.,* the Market Maker.

Additionally, the Court misapplied the very test it created.   First, the Court concluded that neither the Owocs, nor the Debtors, had introduced sufficient evidence to satisfy the first prong.   As to the second factor, the Owocs again put forth unimpeached, uncontradicted, credible evidence that from the creation of the first CEO Account in 2012 (*i.e.*, the Instagram account), through and until the filing of

the bankruptcy action, Jack had enjoyed unilateral and exclusive possession, control, and use of each of the CEO Accounts.  Yet the Court again, ignored this testimony.

As to the third factor, the nature and content of the accounts themselves, the Court concluded that the majority of the postings, across all of the accounts, supported the Debtors' ownership, instead of Jack's, largely based upon the intellectually indefensible and factually inaccurate assertion that any posting with an image of the Debtors' product or brand meant that the posting was one of three (3) made up and virtually indistinguishable categories of a marketing or promotional piece, and not a personal one.  Not only is the Court's distinction between "personal" and "marketing" amorphous and overtly subjective, the Court was wholly and obviously lacking in sufficient evidence upon which to base its findings.  To wit:  of some 6,400 Instagram posts – many of which were videos – the Court only considered a mere fraction of the, 99 to be exact, which is less than 2% of the total posts and even then, the Court reviewed no actual video footage but only a snapshot from the video itself.  The paucity and insufficiency of evidence called for a denial of the motion for summary judgment because there was a genuine dispute over the material question of the primary nature of the CEO Accounts footage.  *See Mella v. Ahmadzai*, 12-CV-23654-JLK, 2013 WL 12064509, at *2 (S.D. Fla. Sept. 5, 2013) ("The lack of sufficient evidence does not permit the Court to grant summary judgment because the facts are unclear.")

## **ARGUMENT**

### **A. The Bankruptcy Court Erred by Failing to Establish Its Jurisdiction to Enter the Order, Which Should Be Deemed Invalid.**

The court here erred by failing to first determine whether the proceeding was or was not a core proceeding. *See* 28 U.S.C. § 157(b)(3); *In re Marill Alarm Systems, Inc.*, 81 B.R. 119, 122 (S.D. Fla. 1987) ("It is a critical and mandatory duty of the bankruptcy judge to determine the nature of an adversary proceeding pursuant to 28 U.S.C. § 157(b)(3)").  Courts deem such failure to invalidate any final judgment.  *Id.* at 122 (final judgment entered without first determining the nature of the proceeding under § 157(b)(3) "is invalid because it was rendered outside of [the bankruptcy judge's] jurisdiction.").  Accordingly, the Order should be reversed.

### **B. The CEO Accounts are bound by Executory Contracts, which were not Identified in the Bankruptcy Filings and are Deemed Rejected.**

The CEO Accounts are not property rights but are instead rights to access the social media pages, which is contractual in the form of a service contract and governed by terms set forth by each of the social media platforms.  *See Eagle v. Morgan*, 2013 WL 943350, at *10 (E.D. Pa. Mar. 12, 2013) ("LinkedIn account is not tangible chattel, but rather an intangible right to access a specific page on a computer"); Alexandra L. Jamel, *Mixing Business with Pleasure: Evaluating the Blurred Line Between the Ownership of Business and Personal Social Media Accounts Under § 541(A)(1)*, 33 EMORY BANKR. DEV. J. 561, 587-589 (2017);

*see also In re Alexandria Surveys Int'l, LLC,* 500 B.R. 817, 822 (E.D. Va. 2013). (domain name is not property of the estate but a "product of contract for services" because the domain name cannot exist without its respective service provider); *In re Powell*, Case No. C17-1268RSL, Bankr. Case No. 12-11140MLB (W.D. Wash. Sep 11, 2017) ("The bankruptcy court ultimately determined the right to use the domain name was an executory contract.").

When a user sets up an account with a social media platform such as Instagram, TikTok, and/or Twitter, it is required to agree to the social media platform's respective terms of use or service ("Terms"), which become a contract, or an executory contract, between the social media user, in this case Mr. Owoc, and the social media platforms, *i.e.,* Instagram, TikTok, and Twitter. *See* https://help.instagram.com/581066165581870 (the "Instagram TOU"), https://www.tiktok.com/legal/page/us/terms-of-service/en (the "TikTok TOS", or https://twitter.com/en/tos (the "Twitter TOS", collectively the foregoing are the "Social Media Contracts").[10] *See* **Composite Ex. D**. Mr. Owoc entered into Social Media Contracts with all three (3) social media platforms at issue in this case.[11]

---

[10] The Owocs have requested that the Court take judicial notice of each of the three Social Media Contracts.

[11] Although Mr. Owoc was unable to offer into evidence the original Terms or contracts with Instagram, TikTok, and Twitter that he agreed to when establishing his accounts, the Court can reasonably infer from the existence and extensive use of his CEO Accounts, that Mr. Owoc had, in fact, entered into a contractual relationship with each of Instagram, TikTok, and Twitter. *See Eagle*, 2013 WL 943350 at *11.

If the social media account holder transfers rights without the social media platform's consent, a claim for breach of contract may arise.[12]  When the Court granted summary judgment and forced Mr. Owoc to turn over his password and the transfer of Mr. Owoc's CEO Accounts, it arguably constituted a breach of his Social Media Contracts.

When a petitioner files a voluntary bankruptcy petition under chapter 11, the debtor must include a schedule of executory contracts.   Fed. R. Bankr. P. 1007(b)(1)(C).   The executory contracts are to be set forth on Schedule G of the docket in the main bankruptcy case.   Debtors did not list the Social Media Contracts on Schedule G – or anywhere – in conjunction with the bankruptcy petition and related papers.   *Id.*   The Debtor's failure to include the Social Media Contracts in the

---

Moreover, as with any "terms and conditions" type of click through agreements on the Internet, virtually no one keeps copies of such terms as they simply check a box or click "agree" and the accounts are several years old, with the Instagram account being over 10 years old.  Additionally, due to the rocket docket nature in which this case has been handled, combined with the fact that the Owocs had no counsel representing them in this proceeding when the Motion for Summary Judgment was filed and the Owocs' counsel filed a notice of appearance 13 days before the MSJ hearing, the Owocs did not have time to engage in discovery.  Both Mr. and Mrs. Owoc stated in their declarations that they needed additional discovery.  *See, e.g.*, *ECF* 16-3 p. 213 ¶¶ 29-31.

[12] *See* Instagram TOU ("[y]ou cannot transfer your rights or obligations under this agreement without our consent" and "you can't sell, license, or purchase any account or data obtained from us or our Service……This includes…transfer any aspect of your account (including your username); solicit, collect, or use login credentials or badges of other users; or request or collect Instagram usernames, passwords…"); TikTok TOS ("[it] is important that you keep your account password confidential and that you do not disclose it to any third party.").

petition is fatal and the Social Media Contracts are deemed rejected.  The Order was erroneous and must be reversed.

### C.    The Court should have Stricken the Testimony of John DiDinato.

DiDonato's declaration violated both the Federal Rules of Evidence and the Federal Rules of Civil Procedure and should have been stricken in that DiDonato held no personal knowledge about the matters he attested to his declaration, and the Debtors provided no indication of which, if any, employees could or would be able to provide first-hand testimony at any trial, as required by the rules.  *See* Fed. R. Civ. P. 56(c)(4) (a "declaration used to support ... a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."); Fed. R. Evid. 602 ("…witness may testify to a matter only if evidence is introduced to support a finding that the witness has personal knowledge of the matter").

### D.    The Ownership Test is Defective.

As with so many of the Court's rulings throughout this case, the Court's result and the Ownership Test employed to get there, seem more of the proverbial 'tail wagging the dog' of the analysis. The Ownership Test omits crucial factors from its analysis, prioritizes random factors over the fundamental indicia of ownership, relies on overly amorphous and subjective factors, and is not neutrally applicable because

it penalizes Market Makers who end up in ownership disputes with their very own solely owned former companies – the fact pattern faced by the lower Court.

> **1.** **The Ownership Test ignores the absence of corporate policies or contracts establishing corporate ownership of social media.**

The Ownership Test's first prong, *i.e.*, the existence of documents or contracts establishing ownership, as articulated by the Court, fails to account for the *absence* of employment contracts, corporate work-for-hire policies, or similar documents establishing ownership.  Where, as here, a business fails to adopt policies or agreements that delineate ownership of its social media assets, despite its obvious incentive to do so, it is proper for the fact-finder to draw an inference *against* the company's claim of ownership and in favor of the individual's ownership.  *See Eagle*, 2013 WL 943350 at *16 (former founder did not misappropriate social media account where company claimed but could not substantiate policy that social media accounts were company property).

> **2.** **The Ownership Test ignores the likely violation of federal and state law and / or terms of the social media platforms.**

Where, as here, a determination in favor of one party would facilitate a violation of federal or state law, or a breach of the Terms, the Ownership Test should cut in favor of the other party.  Here, each of the CEO Accounts includes images of Mr. Owoc as the profile picture and his name "Jack Owoc" in the "name" on the account. ECF 16-3 p. 29, 119, 194.  In ordering the transfer of accounts bearing Jack

Owoc's name and likeness, the order facilitates a violation of the Lanham Act, which prohibits false endorsement, *i.e.*, connecting someone's image and likeness to a product in a way that falsely implies their endorsement of the same, and a violation of section 540.08, Fla. Stat., prohibits the of the use of someone's name, photograph, or other likeness for commercial or advertising purposes without their consent.  *See* 21 U.S.C. § 1125(a); Fla. Stat. § 540.08.

Each of the social media platforms have Terms.  *See* **Comp. Ex. D**.  The sharing of the passwords and change of ownership from Mr. Owoc to Debtors is arguably a breach of each of these Social Media Contracts.  Moreover, Instagram's TOU make clear that once verified, the name on the account <u>cannot</u> be changed.  *See* **Ex. E**, Verification Page, ("Once verified, public figures . . . may not change their username on their account.")[13]

### 3. *The Ownership Test ignores Jack Owoc's intellectual property rights to his name, image, and likeness.*

The CEO Accounts all included images of Mr. Owoc as the profile picture and his name "Jack Owoc" in the "name" on the account.  It isn't a stretch to assume that Mr. Owoc's followers knew that the CEO Accounts were Mr. Owoc's personal accounts, due to the fact that his personal name, image, and likeness were on all of

---

[13]    As a result of the court entering a ruling in conflict with Instagram's TOU, Jack Owoc has now, all but been barred, from obtaining a new, verified Instagram account, thus crippling his ability to continue to develop and market his own persona, which is a flagrant violation of Mr. Owoc's first amendment rights.

the CEO Accounts.  Mr. Owoc's followers could and likely did follow VPX's Corporate Accounts, which, notably, did not have Mr. Owoc's name, image and likeness, but instead the Bang name and/or logo.

With respect to the Instagram Account, Instagram provides the option for an account to obtain the sought after "verified badge," which is a confirmation that a notable account is the authentic presence for a unique person.[14]  Jack Owoc's unique persona, verified as such by Instagram and the name, Jack Owoc, is protected by trademark law,[15] all supports the fact that Jack owns the intellectual property to his distinctive persona and name and the goodwill associated therewith, under the Lanham Act, which cuts against granting the Debtors ownership of the CEO Accounts, all of which contain Jack's image, likeness, and name.

### 4. The Ownership Test fails to account for disparate treatment of purportedly similar owned accounts.

---

[14]      *See* https://help.instagram.com/30039577?helpref=faq_content; https://help.instagram.com/312685272613322.   Appellants respectfully request the Court take judicial notice of these publicly available corporate documents in **Exs. D** and **E**, pursuant to FRE 201.

[15]      Mr. Owoc has common law trademark rights in his persona and name Jack Owoc, which is a distinctive and strong trademark, entitled to a great deal of protection.  In fact, the Jack Owoc persona and trademark are famous. Mr. Owoc's Instagram Account had over 1,000,000 followers. [ECF 16-3 p. 29] Mr. Owoc also has four (4) trademark applications pending with the United State Patent and Trademark Office for his name, Serial Nos. 98219214, 98219216, 98219225, and 98219229 for various goods in services in Classes 005, 032, 041, and 045.

The Ownership Test should, but does not, consider whether the account at issue was treated similarly or differently as accounts over which ownership is not in dispute. Here, of course, the Court ignores undisputed testimony and evidence that the Debtors did not handle the CEO Accounts, nor have access or control of them, in the same way as Debtors did with their fifty (50) or so Corporate Accounts. [ECF 16-3 p. 20 ¶¶ 16-18, 21, 25, 45] Under the Ownership Test, this inexplicably different treatment should have corroborated Jack Owoc's claim to ownership.

### 5. *The Ownership Test de-prioritizes exclusive control over custody, access, and content creation as factors.*

The second prong, which separates access from custody, fails to prioritize the importance of one's actual and exclusive custody of the CEO Accounts, which should be corroborative of ownership. *See In re Cogswell*, 622 B.R. 109, 111 (Bankr. M.D. Fla. 2020) ("Under Florida law, possession of personal property creates a rebuttable presumption that a person in possession of property owns it.") Here, the Court ignores the indisputable fact that Owocs exclusively held possession of the passwords, while the Debtors never did. *See* ECF 16-3 p. 20 ¶¶ 16-18 (uncontradicted testimony of Jack Owoc's exclusive custody and Debtors' consistent lack of custody).[16]

---

[16]     Here too, the court's devalues Mr. Owoc's testimony as "conflicting" for the specious reason that the Debtors would sometimes create and post content to his accounts. The court ignores Mr. Owoc's testimony as to the exclusivity of his control over content and the Debtors' consistent lack of control. *Id.* at ¶¶ 21-25. The entirety

The test similarly discounts the importance of Mr. Owoc's exclusive access to the CEO Accounts and the Debtors' consistent lack of exclusive access.  [ECF 16-3 p. 20 ¶¶ 16-18]   Finally, the test pays surprisingly little fare to one's ability to exclusively dictate or reject the content that is posted to the content, which is a fundamental element of ownership, *i.e.*, freedom of use.   Exclusivity of access, custody / possession, and control remain the hallmarks of ownership under Florida law. *See, e.g.*, *In re Thrifty Dutchman, Inc.*, 97 B.R. 101, 106 (Bankr. S.D. Fla. 1988). Mr. Owoc testified without impeachment that he consistently exercised complete unilateral control over the content of the CEO Accounts, while the Debtors never did.[17]  [ECF 16-3 p. 20 ¶¶ 21-25]

### 6.  *The amorphous and subjective use-factor is defective.*

---

of footnote 75 in the court's summary judgment order is based upon speculation as to why Mr. Owoc could not locate the password for the Tik Tok CEO Account, and did not know to which e-mail the two-factor authentication reset link was being sent, as it was based upon neither evidence nor testimony.  Though given the opportunity, Mr. Owoc could easily have explained the inability.  In any event, temporarily misplacing or being unable to access one's online bank account, certainly should not be construed to undermine one's claim to ownership of their account.

[17]   The Sony Deposition makes clear that Mr. Owoc *never* testified that "Vital employees could post to his accounts without his approval."  [ECF 16-6 p. 192]  A fair reading of the transcript reveals Mr. Owoc merely asked if he had to approve videos before posted to his account, he responded that he did not "have to," meaning he was not required to do so by any rule or regulation ("I don't have to ask anybody to do anything.  I run the company.")  *See* ECF 16-2 p. 39:10-23. Mr. Owoc immediately thereafter testified that he had in fact reviewed and approved social media posts to his account before they were posted.  *Id.*

The Ownership Test relies upon three amorphous and highly subjective categories of account content that all favor the Debtor, and one that could favor the individual but for the fact that the prior three examples inevitably swallow the last, *i.e.,* content that is: purely or explicitly promotional…implicitly promotional…subtle marketing…and purely 'personal.' [ECF 16-6 p. 9 n. 34]   As articulated, this factor should never have been given predominant status over the more fundamental indicia of ownership – exclusivity of possession, access, and use. *Id.* at 25. Even beyond the fact that these categories cannot be utilized with consistency or predictability throughout the judicial system, they are inherently anathematic to the Market Maker model of marketing.

### 7.  *The Ownership Test cannot be fairly applied to Market Makers.*

The Ownership Test is wholly inappropriate for the fact pattern before it, *i.e.,* a dispute between a Market Maker and the entity he created.  For example, the Ownership Test presumes that:  making postings to a social media account that reference your own company's product, that are designed to create revenue for your company, that even though not directly referencing a company or product, but that evoke the product or company, directing employees of your company to assist in the cross-pollination between your persona and the company's product, and wearing apparel of your company or brand in your postings – all must be construed as evidence against the Market Maker owning the account at issue.  The Court even

takes Mr. Owoc to task for failing to introduce evidence "that Mr. Owoc is a social media influencer, that he uses his persona to market any non-Vital products, or that he is paid to do so."  [ECF 16-6 p. 31]  While each of those evidentiary points would have merit in an ownership dispute between a typical social media influencer and a company that hired him/her, they are wholly inapposite to Market Makers, such as Mr. Owoc who is not a social media influencer, who would *never* have marketed non-VPX products, and who was not and would not be expected to be paid for posting on his own social media accounts.

One of the clearest instances of the inapplicability of the Ownership Test to the fact pattern and to Market Makers such as Mr. Owoc, lies in the Court's guidance as to how Courts should consider accounts used to cultivate or promote a persona. [ECF 16-6 p. 27]  According to the Court, "even if the product is not specifically mentioned" if the persona's "thoughts and views relate to the attributes" of a product then the account is more likely company owned.  *Id.*  Thus, the Court is literally ruling that for a Market Maker such as Mr. Owoc (or Donald Trump, Elon Musk, Oprah Winfrey, Kylie Jenner, and the like) simply *talking about subjects that relate to the attributes of the product* on social media will make it more likely that they do not own the account.  The test effectively precludes Market Makers at every turn and activity in their marketing approach from promoting their own brands and company, simultaneously, lest they repudiate from their own social media account.  This Court

should not endorse such an unreasonable disincentive against a unique but potentially incredibly effective marketing strategy.

The Ownership Test is crafted to favor the company that employs a social media influencer. Typically, influencers have a following and fan base pre-existing and entirely separate from the product or brand which hires them. It is precisely this following that companies leverage.

Market Makers, on the other hand, cultivate and develop their persona simultaneous to developing and cultivating their company. In the eyes of the public, the Market Maker and the brand may be considered one and the same or virtually indistinguishable. The test must be set aside.

### E.   The Court Misapplied its Own Test.

The Court failed to make all reasonable inferences in the light most favorable to the Owocs and often, *reversed* that presumption, by affording the Debtors the most favorable inferences while saddling the Owocs with the least.

With respect to the first prong, as noted, the Court failed to infer from the Debtors' inability to introduce a signed or binding employment contract with work for hire provisions, or a global social media policy, that the CEO Accounts were more likely owned by Mr. Owoc. *See Eagle*, 2013 WL 943350 at *16. The Court also failed to apply appropriate favorable inferences to the Debtors' eleven (11) years failure to document or even claim ownership of the CEO Accounts, *despite* their

clear notice of Mr. Owoc's claim as early as May 2022.

Similarly, the Court wholly ignored undisputed evidence that the Instagram Account was a "verified" account, meaning that the account holder had been confirmed as the unique and well-known person that he purports to be.  See **Ex. E**, Verification Page.[18]  Mrs. Owoc testified that she had to provide Mr. Owoc's driver's license to prove he was, in fact, Jack Owoc, in order to obtain the verified badge. [ECF 18 p. 107:14-108:14]   The Court should have accepted the foregoing as evidence in support of Jack Owoc's ownership.

The Court's conclusion that neither party satisfied the second prong of its test, *that is*, exclusive control over the CEO Accounts, stands in direct conflict with substantial, unimpeached, unrebutted record evidence.  [ECF 16-6 p. 29]  Further, the Court's rationale for discounting the Owocs' unimpeached testimony that Jack Owoc had "always had exclusive possession, custody, and control" of the CEO Accounts was that it was "conflicting" with other testimony.  [ECF 16-3 p. 20 ¶¶ 16-18]

While the Court noted that Mr. Owoc had shared the passwords with Debtors' employees, the Court ignored Mr. Owocs testimony that he had provided a certain, limited number of Vital employees with limited access to the passwords, only where

---

18      *See* https://help.instagram.com/733907830039577?helpref=faq_content; *See* https://help.instagram.com/312685272613322

they were "specifically tasked with assisting me with my accounts." *Id.*  It was legal error for the Court to hold that personal ownership precludes the owner from utilizing the assistance of his agents, and indeed, other courts have not so found. *See, e.g.*, *PhoneDog v. Kravitz*, C 11-03474 MEJ, 2011 WL 5415612, at *9 (N.D. Cal. Nov. 8, 2011) (finding principal employers claim that it gave employee agent permission to use social media account with limitations, sufficient to allege ownership or the right to possess).  Such conduct by Mr. Owoc should no more vitiate or undermine his ownership of the CEO Accounts than giving a house-key to a maid service would undermine one's ownership of his home.

First, the Court had before it, and relied upon, an incredibly and small sample size of temporally limited postings.  As but one example, the Instagram account alone had some 6,471 postings – many of which were videos -- spanning a period of 2012-2023, ECF 16-3 p. 4 ¶ 8]  But the Court reviewed a total of "284 recent social media posts," which, even considering *only* the total number of Instagram posts, amounts to consideration of less than 5% of the total posts. [ECF 16-6 p. 9 n. 34] The Court failed to consider any of the postings between 2012 and April 2023, and included no videos, despite the fact that thousands of the Instagram postings, and **all** of the Tik Tok postings, were comprised of videos.  *See id.*

This limited sampling was insufficient to support the Court's global conclusion that there were no disputes of material fact as to the overall nature and

use of the postings to the CEO Accounts.  *Mella*, 2013 WL at *2.  Further, relying upon a single, still "snapshot" from a video-posting to reach a determinative conclusion about the overall nature and impact of the video is definitively unsound and unreliable.

The Court's conclusions here are akin to selecting one row of books, on one shelf, in one room of the Fort Lauderdale Public Library and purporting thereby to determine the nature and type of books in the entire branch.  And in construing but a snapshot of a video, the Court effectively limited its analysis to no more than the covers of those same books without even perusing the table of contents.

Further, the Court's conclusion that the mere appearance of the Debtors' product, logo, or apparel – regardless of length of appearance or other content or messaging, automatically *and definitively* (*i.e.*, beyond reasonable dispute), transforms the posting into a pure marketing exercise that favors the ownership of the CEO Accounts is wrong based upon a *de novo* review.  Indeed, under this analysis, Mr. Owoc's penchant for drinking Bang and wearing Bang apparel or the B logo necklace at depositions would suggest that Debtors owns the transcript video as it would be categorized as "subtle marketing."

### F.    Justice Here Requires Appellants Be Permitted to Conduct Discovery.

The lower court erred in refusing the Owocs' repeated requests to be given the opportunity to conduct discovery, on the grounds that Defendants failed to issue

discovery and failed to demonstrate why discovery was needed to rebut the Debtors'

showing.  ECF 16-6 p. 33; ECF 16-3 p. 12; *Id.* at 213 ¶¶ 29-31(sworn statements

requesting discovery).    During the hearing on the MSJ, the Owoc's counsel

explained that the Owocs needed discovery to rebut the Debtors' summary judgment

showing.  Apr. 25 Hearing Tr. at 79-82.  Critical requests, with the Owocs' rationales,

were made for relevant documents.[19]  *Id.*  The discovery the Owocs sought could

have provided an indisputable basis to satisfy the first two prongs of the Ownership

Test.  Although the Owocs did not file a motion pursuant to Federal Rule of Civil

Procedure 56(d), "the Eleventh Circuit does not require strict compliance with Rule

56 (d)—when justice so requires—as in cases where a motion for summary judgment

has been filed in the preliminary stages of the litigation while discovery remains

ongoing."  *777 Partners LLC v. Pagnanelli*, 20-20172-CIV, 2022 WL 17985958, at

*1 (S.D. Fla. Dec. 29, 2022) (*citing others*).    "[T]he common denominator of" U.S.

Supreme Court cases construing summary judgment motions is "that summary

judgment may only be decided upon an adequate record."  *Fernandez v. Bankers Nat.

Life Ins. Co.*, 906 F.2d 559, 570 (11th Cir. 1990).  Here, the summary judgment

record was inadequate and Mr. Owoc's lack of counsel, and the deluge of serial

---

[19] The Owocs asked for, *inter alia*:  1) account opening documents from Instagram
as well as the terms of service, 2) evidence reflecting Jack Owoc's exclusive access
and control over the CEO Accounts, 3) evidence from the Debtors reflecting Megan
Owocs opening of the CEO Accounts, and 4) evidence showing that the Debtors and
its employees understood the CEO Accounts to be personal property of Jack Owoc.

contempt filings means that justice here requires the Owocs should have been permitted conduct discovery.  ECF 16-3 p. 314:6-19.

## <u>CONCLUSION</u>

As set forth above, Appellants respectfully request that this Court reverse the Order Granting Summary Judgment and grant any further appropriate relief.

## <u>CERTIFICATE OF COMPLIANCE</u>

   This document complies with the S.D. Fla. Local Rule 87.4(f)(2) and Federal Rule of Bankruptcy Procedure 8015(a)(7), in that it is 30 pages, excluding the parts of the document exempted by Fed. R. P. 8015(g). The document further complies with the type-volume limit for a 30 page document because, this document contains 8,688 words.

   This document complies with the typeface requirements set forth by the Court in its Notice of Court Practice [ECF 6] and the type-style requirements of Fed. R. P. 8015(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word Version 2307 in Times New Roman, 12-point Font.

<u>s/ Terry A.C. Gray  </u>       Date: November 27, 2023

Print name of person signing certificate of compliance:

<u>Terry A.C. Gray, Esq.</u>

Dated: November 27, 2023    Respectfully submitted,
*Boca Raton, Florida*

          <u>*/s/* Terry A. C. Gray </u>
          Jordi C. Martínez-Cid
          Florida Bar No. 100566
          Terry A.C. Gray
          Florida Bar No. 100732
          Andy Hernández
          Florida Bar No. 1018581
          Martínez-Cid Law
          1 S.E. 3rd Avenue, Suite 2300
          Miami, Florida 33131
          Telephone: 305-704-9162
          Email: jmartinez-cid@martinez-cidlaw.com
          Email: tgray@martinez-cidlaw.com
          Email: ahernandez@martinez-cidlaw.com
          Email: service@martinez-cidlaw.com
          *Co-Counsel for Appellants John H. Owoc and*
          *Megan E. Owoc*

*/s/ Erica W. Stump*
Erica W. Stump, Esq.
Florida Bar No. 0427632
**ERICA W. STUMP, P.A.**
110 E. Broward Blvd., Suite 1700
Fort Lauderdale, FL 33301
Telephone: (954)-828-2334
Facsimile: (954)-278-8510
Email: erica@ericawstump.com
*Co-Counsel for Appellants John H. Owoc and Megan E. Owoc*

Dated: November 27, 2023              Respectfully submitted,
*Boca Raton, Florida*

    **SCHOEPPL LAW, P.A.**

*Lead Appellate Counsel for Appellants John H. Owoc and Megan E. Owoc*
160 West Camino Real, No. 229
Boca Raton, Florida 33432-5942 Telephone: (561) 394-8301
Facsimile: (561) 394-3121
E-Mail: carl@schoeppllaw.com

By: */s/ Carl F. Schoeppl*
Carl F. Schoeppl
Fla. Bar No.: 818518

By: */s/ Jonathan S. Feldman*
JONATHAN S. FELDMAN, ESQ.
Florida Bar. No. 12682

**PHANG & FELDMAN, PA**
*Attorneys for Appellant/Defendant John H. Owoc and Defendant Megan E. Owoc*
One Biscayne Tower, Suite 1600
2 South Biscayne Boulevard
Miami, Florida 33131

2

Telephone: (305) 614-1223
Facsimile: (305) 614-1187
Email: feldman@katiephang.com

## <u>CERTIFICATE OF SERVICE</u>

    **I HEREBY CERTIFY** that on November 27, 2023, I electronically filed the foregoing with the Clerk of the Court by using the Florida Courts E-Filing Portal System which served the document on all counsel of record.

By: <u>*/s/* **Terry A. C. Gray**     </u>
     Terry A.C. Gray
     Florida Bar No. 100732
