# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
# FORT LAUDERDALE DIVISION

_____

CASE NO. 23-cv-61382-SINGHAL
_____

JOHN H. OWOC and MEGAN E. OWOC
Appellants,

vs.

VITAL PHARMACEUTICALS, INC., *et al.,*
Appellees.

_____

ON APPEAL FROM THE COURT
SOUTHERN DISTRICT OF FLORIDA
LOWER TRIBUNAL ADV. CASE NO. 23-01051-PDR-A

_____

## <u>APPELLANTS' REPLY BRIEF</u>

**SCHOEPPL LAW, PA**
*Lead Appellate Counsel for Appellants*
*John H. Owoc and Megan E. Owoc*
160 West Camino Real, No. 229
Boca Raton, Florida 33432-5942
Telephone: (561) 394-8301
Facsimile: (561) 394-3121
Email: carl@schoeppllaw.com


**PHANG&FELDMAN, PA**
*Counsel for Appellants*
*John H. Owoc and Megan E. Owoc*
One Biscayne Tower, Suite 1600
2 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 614-1223
Facsimile: (305) 614-1187
Email: feldman@katiephang.com

**MARTINEZ-CID LAW**
*Counsel for Appellants*
*John H. Owoc and Megan E. Owoc*
1 S.E. 3rd Avenue, Suite 2300
Miami, Florida 33131
Telephone: (305) 704-9162
Email: jmartinez-cid@martinez-cidlaw.com
Email: tgray@martinez-cidlaw.com
Email: ahernandez@martinez-cidlaw.com


**ERICA W. STUMP, P.A.**
*Counsel for Appellants*
*John H. Owoc and Megan E. Owoc*
110 E. Broward Blvd., Suite 1700
Fort Lauderdale, FL 33301
Telephone: (954) 828-2334
Facsimile: (954) 278-8510
Email: erica@ericawstump.com

## **TABLE OF CONTENTS**

Page(s)

**SUMMARY OF ARGUMENT**................................................................................... 1

   **I.**    **ARGUMENT** ............................................................................................... 3

      **A.**    **The Ownership Test is Defective in Failing to Take Note of the Absence of Any Social Media Policy or Any Employee Policies Applicable to the Owocs.**...........3

      **B.**    **The Fact that the Bankruptcy Court's Ruling Likely Creates a Federal and State Violation of Law is Relevant to Determining Ownership.** ........................6

      **C.**    **The Debtors' Disparate Treatment of the Owocs's Social Media Accounts is Critical Evidence from which a Reasonable Juror Could Have Found in Favor of the Owocs.** ......................................................................................7

      **D.**    **The Bankruptcy Court De-Prioritizes Exclusive Control Over Custody, Access, and Content Creation.** ............................................................9

      **E.**    **The Ownership Test's Vague and Amorphous "Use" Categories Defy Application and Indeed, the Bankruptcy Court Misapplied Them.** .................10

      **F.**    **DiDonato's Declaration was Not Based Upon Personal Knowledge and Should Have Been Excluded.**........................................................................15

      **G.**    **Summary Judgment was Premature Since the Owocs were Denied the Opportunity to Conduct Discovery.** .........................................................16

   **CONCLUSION** ...................................................................................... 17

i

## <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*Access Now, Inc. v. Sw. Airlines Co.,*
  385 F.3d 1324 (11th Cir. 2004) ............................................................................... 2, 10

*Eagle v. Morgan*,
  2013 WL 943350, at *10 (E.D. Pa. Mar. 12, 2013) ............................................... 4, 6, 8

## <u>SUMMARY OF ARGUMENT</u>

The Bankruptcy Court created new law (the "Ownership Test") because the construction and interpretation of social media ownership is a new area, with scant case law, and few appropriate factual scenarios from which to draw.  However, the Ownership Test is inherently defective in that it fails to prioritize the most defining characteristics of property under American jurisprudence: Ownership, Possession, and Control.  Instead, the Ownership Test prioritizes other factors and creates amorphous, highly subjective categories that amount to little more than a Rorschach Test.

It is clear that the Ownership Test fails the most important requirement for any legal standard – newly minted or otherwise – the Ownership Test cannot be fairly and evenhandedly applied to the totality of stakeholders who are subject to its strictures. Market Makers such as Mr. Owoc have no hope of equitable consideration under the Ownership Test because it seems all but designed to preclude any possibility that a corporation's owner and CEO can simultaneously, synergistically, interrelatedly market their own persona, *and* market their company's products, while maintaining personal ownership of the very social media account which they use to do so. This cannot be the law.

As explained to the Bankruptcy Court, and argued to this Court, Jack Owoc is a Market Maker, meaning he, and his wife Megan Owoc, successfully conceptualized, created, and simultaneously cross-marketed Vital's flagship product, Bang Energy Drink, along with the Jack Owoc persona.  As a result, a legal test aimed at distinguishing personal ownership of social media from corporate but that penalizes the individual whenever his postings or content refer to his company or product, is inherently biased and wholly defective:  cross marketing, synergy, and complete overlap between the individual and the company is the defining element of a Market Maker marketing approach.  As noted, the clear, unworkable bias inherent in the Ownership Test

is reflected in the fact that according to the Bankruptcy Court, *anytime an individual speaks, writes, or talks about subjects that reflect and invoke the attributes or features of the product at issue, the Court should deem the posting as one indicative of corporate ownership.* ECF 16-8 at 190.

Even if this Court were to accept the Bankruptcy Court's indisputably biased test, it is nonetheless evident that the Bankruptcy Court misapplied its own test, by reaching factual conclusions in favor of the Debtors' ownership that are clearly erroneous. For example, the Bankruptcy Court and Appellee's rely heavily upon the position that "VPX employees created, had access to, and maintained the CEO Accounts." Appellee's Answ. Br. at 11. No. Megan Owoc created the Instagram and Twitter accounts personally, and specifically directed another employee to create the TikTok account. ECF 16-3 at p. 208, ¶¶ 8, 14-15. Indeed, Mrs. Owoc's testimony that she "developed our [Vital's] entire social media strategy," was unrebutted. *See* May 25, 2023 Hrg Tr. at 103:23-25. And no, Debtors neither had access to, nor maintained the CEO Accounts, *other than as specifically and expressly directed and designated by the Owocs.*

Appellee's Answer Brief is largely comprised of irrelevant, contextual background and reutterance of the very same, factually unwarranted, record-defying, conclusory findings made by the Bankruptcy Court. Uttering it, or writing it, does not make it so. Appellee repeatedly argues that numerous appellate arguments of the Owocs were not made at the trial court or preserved for appeal, but the Eleventh Circuit has made clear that where, as here, an "appellant raises an objection to an order which he had no opportunity to raise at the district court level," the Appellate Court may consider the issue. *See Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1332 (11th Cir. 2004). Similarly, where, as here, the trial court has created new law such that the issue involves a pure question of law, the Appellate Court may consider an issue not raised in the trial court. *Id.* Ultimately, none of Appellee's arguments can undermine the fact that the Ownership Test is

defective, inherently biased, and that the Bankruptcy Court misapplied that test by reaching conclusions of law that the record does not support.

## I.    ARGUMENT[1]

### A.    The Ownership Test is Defective in Failing to Take Note of the Absence of Any Social Media Policy or Any Employee Policies Applicable to the Owocs.

The Ownership Test is defective for a variety of reasons, including its failure to take into account and allocate an inference of proof based upon the Debtors's failure to establish a policy governing use and ownership of social media, based upon the absence of contracts or employee agreements addressing the Owocs's ownership of their social media, and based upon Debtors's extended durational failure to even raise Vital's purported ownership, despite its knowledge that the Owocs claimed the accounts as their own. *See, e.g.*, Appellant's Brief at p. 8, 18. Indeed, the record is simply devoid of any such policy.

Appellee responds by simply claiming that there was such a policy, but failing to point to one. Appellee's Answ. at p. 19. Instead, Appellee points to an employee handbook, which on its face does not address or contain a social media policy. *Id.* at 19. Appellee omits the fact that Mr. and Mrs. Owoc each denied that they ever executed, or were bound by, the employee handbook, and further omits the fact that the Debtors were unable to procure or introduce evidence to the contrary. As the only witnesses introduced with firsthand knowledge, the Owocs's unimpeached, uncontradicted testimony should not have been discounted.

Appellee's argument that the Debtor's Founder, CEO, sole shareholder, and his wife were bound by an "employee handbook" which there is no evidence they ever signed, and no evidence

---

[1]    Appellants do not abandon but reserve all rights with respect to arguments raised in their Initial Brief, but here not advanced due to space limitations.

the Debtor asked them to sign, or sought to enforce against them, is neither reasonable, nor credible.

The penultimate point, however, is that the Bankruptcy Court acknowledged the importance of a corporation's social media policy, and the importance of documents reflecting a social media policy, but failed to acknowledge the importance of *the absence* of such a policy or such documents – or to give material effect to their absence.  Between the individual versus the corporate entity, it is exclusively the latter, who at any time, could have created an actual policy governing the ownership and use of social media, and further, could have directed Mr. Owoc to execute and agree to be bound by such a policy, had Vital deemed it important to do so.

Indeed, Appellee fails to meaningfully distinguish *Eagle Eagle v. Morgan*, wherein, like the case now before this Court, the owner of the company formed a social media account under her name.  *Eagle v. Morgan*, 2013 WL 943350, at *10 (E.D. Pa. Mar. 12, 2013).  In *Eagle*, the Eastern District of Pennsylvania found that a social media website was the property of the founder and former owner of a company where the website displayed the name and picture of the founder, *id.* at *3, the founder had created the account using a company e-mail system, *id.* *2, the founder had turned over the passwords to the account to company employees to assist with specific, limited tasks, *id.* at *3, the company "never had a policy" requiring the use of social media, "did not dictate the precise contents of an employee's" social media account, and "did not pay for its employees'" social media accounts.  *Id.* at *16.  Moreover, the *Eagle* Court afforded great significance to the fact that the terms of use for the social media account at issue stated that the account was between the social media service "and the individual user."  *Id.*

Here too, as reflected in the exhibits, Mr. Owoc's legal name and likeness is prominently displayed on the landing page of **<u>each</u>** of the CEO Accounts at issue. ECF 16-3 at p. 29. Here too,

Mr. Owoc and Mrs. Owoc created the accounts at issue (or directed their creation) using a company e-mail, and shared the password with a limited group, only for specific, limited projects. *Id.* at p. 22, ¶¶ 23-26. Here too, Mr. Owoc used the social media account in his individual capacity, meaning for purposes of marketing the Jack Owoc persona, alongside and simultaneous to, marketing the company product. *Id.* at p. 20, 23 at ¶¶ 12-13, 28-34.

The Debtors' failure to create or enforce a social media policy here is even more problematic than in *Eagle* because here, the Debtors had actual knowledge – more than a year before the adversary action – that Mr. Owoc claimed the CEO Accounts as his own personal property. Indeed, Mr. Owoc testified to as much – repeatedly – during a deposition wherein he was represented by the General Counsel of Bang. *See* Appellants' Initial Brief at p. 8.

However, the Bankruptcy Court ignored this fact, and further ignored Appellant's critical evidence demonstrating that the Debtors, through their Chief IP Counsel, Gideon Eckhouse, Esq., expressly informed Mrs. Owoc (and through her, Mr. Owoc), prior to the initiation of the bankruptcy, that "Personal accounts, such as yours and Jack's, would be excluded . . ." from the Debtor's estate. *See* ECF 16-3 at p. 217.[2] This critical admission alone amounts to sufficient evidence from which a reasonable jury could have concluded that the CEO Accounts were the property of Mr. and Mrs. Owoc, that the Debtors knew it, and that the Debtors agreed to the same. Indeed, the Owocs specifically alleged in their affirmative defenses (which were never expressly considered by the Bankruptcy Court) that the Debtors' assertion of ownership was barred by doctrines such as Estoppel, Waiver, and Laches.

---

[2]     The Bankruptcy Court deemed the first sentence of the second paragraph to be privileged, and thus it is not set forth in this brief. *See* April 25, 2023 Hrg. Tr. at 37:2 – 42:9. However, the parties and the Court agreed that the latter two sentences in the second paragraph could be considered and discussed, *id.*, albeit there is no indication from the Bankruptcy Court's ruling that it did in fact consider the document.

Simply taking note of the fact that neither party had introduced documentation reflecting their alleged ownership of the CEO Accounts puts the cart entirely before the horse in that if the corporation lacks a coherent, established social media policy – one would expect an absence of such documentation – as neither the individual nor the entity would foresee the need to create them.  But the Bankruptcy Court's analysis fails to account for the lack / absence of any such social media policy from the beginning.  Here, an inference against corporate ownership should have been drawn.

**B.     The Fact that the Bankruptcy Court's Ruling Likely Creates a Federal and State Violation of Law is Relevant to Determining Ownership.**

Appellee takes the surprising position that whether or not the Bankruptcy Court's ruling would result in a violation of Federal or Florida state law is irrelevant to ownership.  Appellee's Answ. at p. 21.  Where, as here, a determination in favor of one party would facilitate a violation of federal or state law, or of the account's terms and conditions, the Ownership Test should cut in favor of the other party.   Indeed, in *Eagle*, the court specifically found that the Defendant corporation that had entered the Plaintiff founder's social media account and changed the password could be liable for tortious interference with the Plaintiff's contract, and that further, the founder could not be liable for misappropriating the social media account as her own.  *Eagle*, 2013 WL 943350 at * 10, *16.  In both findings, the court focused upon the significance of the fact that the founder had entered a contractual relationship with the social media account, *id.* at *11, *16.  Any ruling construing ownership that necessarily would up-end what must be presumed (absent evidence to the contrary) to have been a legal and permissible undertaking by the parties involved, should serve as a warning light for any such ruling.

Contrary to Appellee's claim, the Owocs presented argument and evidence to the Bankruptcy Court that the verification of Mr. Owoc's Instagram CEO Account was a crucial fact

because the verification meant that the person held out has been confirmed as authentically whom he or she purports to be.  *See* May 25, 2023 Hrg Tr. at 103-105. The Court ignored Mrs. Owoc's testimony that she had to provide Mr. Owoc's driver's license to prove he was, in fact, Jack Owoc in order to obtain the verified badge.

The inability to change ownership pursuant to the Terms and Conditions and Terms of Use of the social media accounts is highly relevant, contrary to Appellee's position, because the contracts between the social media service provider and the account holder are one of the few instances of documented, tangible evidence of ownership.  Indeed, considering the importance of such documents, the Bankruptcy Court's refusal to permit Mr. Owoc to conduct discovery to obtain these documents is even more inexplicable.  The Appellee is also flatly wrong in contending that the Instagram Terms of Service were not introduced as both the Debtors *and* the Owocs introduced the same in supplemental briefing to the Court.  *See, e.g.*, ECF 16-8 at p. 1-23.

**C.    The Debtors' Disparate Treatment of the Owocs's Social Media Accounts is Critical Evidence from which a Reasonable Juror Could Have Found in Favor of the Owocs.**

The Ownership Test is defective because it does not consider disparate treatment between social media accounts undisputedly owned by the company versus those at issue.  This factor is a critical element in evaluating competing claims of ownership but was omitted by the Bankruptcy Court in favor of factual conclusions, wholly unsupported by the record evidence.  The Bankruptcy Court and its Ownership Test ignore undisputed testimony and evidence that the Debtors did not handle the CEO Accounts, nor have access or control of them, in the same way as Debtors did with their fifty (50) or so other Corporate Accounts. ECF 16-3 at ¶¶ 16-18, 21, 25, 45.  Under the Ownership Test, the absence of contradictory evidence should have been deemed fatal to the Debtors' summary judgment motion.

7

Instead of looking to uncontested record evidence demonstrating that the CEO Accounts were always treated differently than the plethora of Debtors' other social media accounts, the Bankruptcy Court reached the unsubstantiated conclusion that "both parties had access to the CEO Accounts." Appellee's Answ. at p. 22. However, this conclusion is unsupported by the record.

The Bankruptcy Court's rationale for discounting the Owocs's unimpeached testimony that Jack Owoc had "always had exclusive possession, custody, and control" of the CEO Accounts was that it was "conflicting" with other testimony. ECF 16-3 at ¶ 16-18; ECF 161. While the Bankruptcy Court noted that Mr. Owoc had shared the passwords with Debtors' employees, the Bankruptcy Court ignored Mr. Owoc's testimony that he had only provided a certain, limited number of Vital employees with limited access to the passwords, where they were "specifically tasked with assisting me with my accounts." ECF 16-3 at ¶ 19.

This sort of limited and specific delegation is completely different from the kind of wholesale, unlimited, general access reflected in the Bankruptcy Court's conclusion that "both parties had access to the CEO Accounts." ECF 16-8 at 293. Indeed, if both parties had access to the accounts in the way found by the Bankruptcy Court, the Adversary Proceeding would have been largely unnecessary because the Debtors would have had the passwords. *See also* DE 40, ECF 16-3 at p. at 11 ("[W]hen the Debtors' Social Media Manager, Christina Weronik, whose responsibilities include securing and managing all corporate social media passwords, was asked for the passwords to the Accounts, she did not have them.") Moreover, as noted, the *Eagle* Court did not find such a limited and specific delegation to undermine or impair its conclusion that the social media accounts in that case were the property of the founder, not the company. *See Eagle*, 2013 WL 943350 at *3.

Appellee attempts to buttress the Bankruptcy Court's incorrect and unsubstantiated finding that 'both parties had access" by speculating, based upon nothing in the record, as to the capacity within which those Vital employees were acting when tasked by Mr. or Mrs. Owoc to perform functions specific to his accounts, and even speculating as to Mr. Owoc's intent.  Appellee's Answ. at p. 22-23.  This indeed was discovery the Owocs sought but were denied.  *See infra.* And Appellee's entire argument here merely confirms that summary judgment was premature because further evidence was warranted, that there were disputed issues of material fact, that the Bankruptcy Court's finding to the contrary was in error, and that a reasonable juror could very well have reached a contrary conclusion.

### D.   The Bankruptcy Court De-Prioritizes Exclusive Control Over Custody, Access, and Content Creation.

The record in this case soundly and clearly demonstrates that Jack Owoc and his wife Megan Owoc consistently held exclusive possession of the passwords, while the Debtors never did.  The **only** way the Court (and Appellee) are able to reach a different conclusion is by ignoring Mr. Owoc's uncontradicted testimony as to his exclusive custody and the Debtors' lack of custody, for example, as set forth in ECF 16-3 at p. 20 ¶¶ 16-18. The Debtors never had unfettered access to the accounts, or any form of unilateral, discretionary access to the CEO Accounts.  *Id.*  Debtors' access was limited to the time, purpose, and specific delegation of use directed by Mr. Owoc.  *Id.* In fact, in Debtors' Reply to their Motion for Summary Judgment, they expressly *admitted* that the Owocs controlled the accounts.  *See* Reply, ECF 16-3 at 332 ("While Defendants may historically have controlled the CEO Accounts, they did so when they were the CEO and the head of the Debtors' marketing department respectively.")[3]

---

[3]     It should be noted that rather than cite to the evidentiary record, Appellee does little more than rely upon the factually erroneous, wholly conclusory assertions made by the Bankruptcy

In further derogation of the fundamental precepts of ownership, the Bankruptcy Court wholly ignores and fails to afford proper significance to Mr. Owoc's unimpeached, uncontested testimony that he "always" exercised complete gatekeeping functions as to the content of the accounts, and "full, complete, unilateral discretion as to the content that would be posted," *id.* at ¶¶ 21-22.

> **E.** **The Ownership Test's Vague and Amorphous "Use" Categories Defy Application and Indeed, the Bankruptcy Court Misapplied Them.**

The Bankruptcy Court never afforded the Owocs or the Debtors an opportunity to weigh in on the nascent Ownership Test that it crafted. As a result, the appeal before this Court is the first, and only opportunity that the Owocs have had to set forth their concerns with the inherent inequity at the core of the test.[4] *See Access Now, Inc.*, 385 F.3d at 1332. The test should never have been crafted so as to provide a three-factor preference in favor of corporate ownership, *i.e.*, evaluating content as purely or explicitly promotional, implicitly promotional, or subtly promotional – which all favor the corporation's interests. The categories are so vague, amorphous, and subjective that they can never be applied with consistency or objectivity. And contrary to the Appellee's assertion, Mr. Owoc obviously, and firmly, has argued in his Initial Brief that the Court "misapplied" its own test, *that is*, that the Court's analysis is in fact wrong. Appellant's Initial Brief at 12-13.

_____

Court that are *precisely at issue* in this appeal. However, when one delves into that *actual* record evidence, it is all but unquestionable that the Bankruptcy Courts factual findings on this (and other) points is wholly against the weight of the evidence.

[4]     While the Owocs only recently described Mr. Owoc's unique marketing approach with the term "Market Maker," the evidentiary record and argument presented to the Bankruptcy Court is replete with the Owocs making precisely the same substantive arguments as to the nature, impact, and significance of Mr. Owoc simultaneously marketing and cultivating his persona while marketing and cultivating Bang Energy drink. *See, e.g.*, April 25, 2023 Hrg. Tr. at 63:13 – 67:4; 68:20 – 69:7.

Unlike the Bankruptcy Court, which failed to review anything more than the opening, still-cover image of a tiny fraction of thousands of videos on the Instagram and TikTok CEO Accounts, Mr. Owoc, who personally created and / or approved the entirety of those postings, set forth his sworn belief that some 59% of the Instagram postings reflect his marketing of the Jack Owoc persona, 55% of the TikTok videos reflect his marketing of the Jack Owoc persona, and 82% of the Twitter (now X) postings similarly reflect marketing of the Jack Owoc persona.  *See* ECF 16-3 at p. 4.

To be clear, the Bankruptcy Court's attempt to dissect and divide the social media content of a Market Maker such as Jack Owoc, Kylie Jenner, Donald Trump, Deepak Chopra, Martha Stewart, or Snoop Dogg (now known as Snoop Lion), is a futile exercise because, by definition and nature, the Market Maker is simultaneously cross-marketing their own persona with their product or company.

Thus, it was error for the Court to categorize postings from Mr. Owoc about the beauty of motherhood as indicative of the Debtors owning his Instagram CEO Account, merely because he is wearing Bang apparel and cans of the product can be seen in the background.



It was error for the Court to deem a posting by Mr. Owoc – himself a reputed and well lauded fitness expert – wherein he discusses weightlifting science, as indicative that the Debtors own his Instagram Account because the content evokes the product:





It was error to deem Mr. Owoc's passing reference to himself as the leader of Bang Energy, in a post about creativity and communication, as indicative that the Debtors own his Instagram Account:





As it was error to deem a post about "discipline, effort, sacrifice, and study, " *i.e.*, D.E.S.S., as indicative of corporate ownership because the posting somehow evokes traits or characteristics of Bang Energy Drink:



It was error to deem a family picture of the Owocs as indicative of corporate ownership because Mr. Owoc is wearing Bang branded shorts:



13

Or to deem a posting that does not even mention the product subtle or implicit marketing purely because the content of the text evokes characteristics of the product:[5]



Appellee fails to distinguish or rehabilitate the inequity of the Ownership Test for Market Makers such as Mr. Owoc beyond asserting that a "'Market Maker' could claim personal ownership of any company property that they use for company business." Appellee's Answ. at p. 24. Appellee's argument wholly misses the point that all other forms of corporate property carry clearly established, well-worn, categorical indicia and elements of ownership. But social media

---

[5] Most of the foregoing instances are derived from the Bankruptcy Court's description and putative categorization of postings based upon its Summary Judgment Order, though some, such as the "CAN YOU DO THE VACUUM POSE," are drawn directly from the Court's Order itself. *See* ECF 16-8 at p. 175.

accounts are not vehicles, stock certificates, or literary works.  Indeed, it is precisely the novelty of the issue and scarcity of established indicia that led the Bankruptcy Court to create new law by crafting an entirely new test.  Where, as here however, that test is inherently biased against a small, but significant portion of the litigants to whom it stands to be applied, that test cannot stand.

**F.      DiDonato's Declaration was Not Based Upon Personal Knowledge and Should Have Been Excluded.**

As previously set forth, Mr. DiDonato's declaration was based not only upon some personal knowledge he allegedly garnered during the short period of time since he was hired by the Debtors, but also upon unspecified "discussions with members of the Debtors' management, the Chief Transformation Officer's teams, the Debtors' other advisors . . . ."  ECF 16-2 at ¶ 3.  The Declaration wholly fails to identify which portions of the Declaration are based allegedly upon Mr. DiDonato's personal experience and which portions are based upon second or third hand conversations and amount to hearsay.  For example, DiDonato's Declaration asserts that the Instagram account was "created in April 2012 with . . . more than 6400 posts, a vast majority of which promote the Debtors' products and businesses."  *Id.* at ¶6.  But there is no indication as to how Mr. DiDonato obtained this purportedly factual information as he was not with the Debtors in 2012, and any Court would be incredulous as to whether he actually reviewed the 6400 plus postings on the Instagram CEO Account.  *See also id.* at ¶ 7 (attesting that each of the more than 7,000 Twitter postings includes "content primarily focused on promoting the Debtors' products and business." ).

The Bankruptcy Court's reliance on Mr. DiDonato's Declaration is particularly troublesome in light of the fact that it considered but a thimbleful of the actual postings on the CEO Accounts, and even then, failed to consider or review the actual videos, relying instead upon a mere, still snapshot to make far-reaching conclusions about the remaining content, meaning, and

import of the video.  Regardless of which party introduced the evidence, there can be no question but that the Bankruptcy Court had before it an insufficient sampling of social media data, and was severely lacking in not having the actual videos, such that summary judgment should not have been granted on this record.

The Bankruptcy Court's reliance upon the DiDonato Declaration, and its reliance on the incredibly small sampling of incongruous data, is even more problematic in light of the Bankruptcy Court's refusal to allow Mr. Owoc to conduct discovery.

G.    Summary Judgment was Premature Since the Owocs were Denied the Opportunity to Conduct Discovery.

The Bankruptcy Court's unnecessary rush to judgment is perhaps nowhere more clearly demonstrated than in its unwarranted refusal to permit the Owocs to conduct critical discovery. Appellee's (and the Bankruptcy Court's) argument that the Owocs failed to articulate any specific need for discovery or the ultimate relevance of that discovery eclipses credibility.  Mr. and Mrs. Owoc attested in their respective declarations that they needed additional discovery (such as a deposition of Mr. DiDonato, terms of service and contracts with the social media companies, copies and versions of the employee handbooks and any policies, testimony from Debtors's appropriate personnel as to their understanding of the role they performed when servicing the Owocs's social media accounts, and their understanding of the ownership of those accounts), and why.  *See* ECF 16-3 at p. 24-25, ¶¶ 37-40 ;ECF 16-3 at p. 213-14, ¶¶ 29-31.  The Owocs's Bankruptcy Counsel discussed the same, at length, with the Bankruptcy Court.  *Id.* at 79:17 – 82:19.  Considering the highly fact intensive inquiry underlying the Bankruptcy Court's analysis, and the ultimate importance the Ownership Test ascribed to facts such as the terms of the social media account contracts, or the existence of a corporate social media policy applicable to the

Owocs, it was reversible error for the Court to refuse to allow the Owocs to engage in discovery that could have provided clear, definitive answers to these issues.

## CONCLUSION

Wherefore, for the foregoing reasons, the Owocs respectfully request that this Court enter an Order reversing the judgment of the Bankruptcy Court, remanding this matter for further proceedings, including discovery and an evidentiary hearing, and granting such other and further relief as this Court deems just and appropriate.

## CERTIFICATE OF COMPLIANCE

This document complies with the S.D. Fla. Local Rule 87.4(f)(2) and Federal Rule of Bankruptcy Procedure 8015(a)(7), in that it contains 4,872 words.

This document complies with the typeface requirements set forth by the Court in its Notice of Court Practice [ECF 6] and the type-style requirements of Fed. R. P. 8015(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word Version 2307 in Times New Roman, 12-point Font.

s/ Terry A.C. Gray ____                                    Date: February 26, 2024

Print name of person signing certificate of compliance:

Terry A.C. Gray, Esq.

Dated: February 26, 2024                    Respectfully submitted,
*Boca Raton, Florida*

                                         /s/ Terry A. C. Gray ____
                                         Jordi C. Martínez-Cid
                                         Florida Bar No. 100566
                                         Terry A.C. Gray
                                         Florida Bar No. 100732
                                         Andy Hernández
                                         Florida Bar No. 1018581
                                         Martínez-Cid Law
                                         1 S.E. 3rd Avenue, Suite 2300
                                         Miami, Florida 33131
                                         Telephone: 305-704-9162
                                         Email: jmartinez-cid@martinez-cidlaw.com
                                         Email: tgray@martinez-cidlaw.com
                                         Email: ahernandez@martinez-cidlaw.com

17

*Co-Counsel for Appellants John H. Owoc and Megan
E. Owoc*

*/s/ Erica W. Stump*
Erica W. Stump, Esq.
Florida Bar No. 0427632
**ERICA W. STUMP, P.A.**
110 E. Broward Blvd., Suite 1700
Fort Lauderdale, FL 33301
Telephone: (954)-828-2334
Facsimile: (954)-278-8510
Email: erica@ericawstump.com
*Co-Counsel for Appellants John H. Owoc and Megan
E. Owoc*

Dated: February 26, 2024                Respectfully submitted,
*Boca Raton, Florida*

**SCHOEPPL LAW, P.A.**

*Lead Appellate Counsel for Appellants John H. Owoc
and Megan E. Owoc*
160 West Camino Real, No. 229
Boca Raton, Florida 33432-5942 Telephone: (561)
394-8301
Facsimile: (561) 394-3121
E-Mail: carl@schoeppllaw.com

By: */s/ Carl F. Schoeppl*
Carl F. Schoeppl
Fla. Bar No.: 818518

By: */s/ Jonathan S. Feldman*
JONATHAN S. FELDMAN, ESQ.
Florida Bar. No. 12682

**PHANG & FELDMAN, PA**
*Attorneys for Appellant/Defendant John H.
Owoc and Defendant Megan E. Owoc*
One Biscayne Tower, Suite 1600
2 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 614-1223
Facsimile: (305) 614-1187

18

Email: feldman@katiephang.com

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on February 26, 2024, a true and correct copy of the foregoing

was electronically filed and served via CM/ECF upon all counsel of record in this case.

By: <u>*/s/* **Terry A. C. Gray**___</u>
Terry A.C. Gray
Florida Bar No. 100732

19